UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHARLES A. HORTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 17-cv-01230 (APM) |
| FABIAN ESPINDOLA, et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

**I.  INTRODUCTION**

Plaintiff Charles Horton is a former goalkeeper for Defendant D.C. United, Washington, D.C.'s Major League Soccer ("MLS") team. Plaintiff alleges that his career came to an untimely end after a teammate, Fabian Espindola, assaulted him during a dispute that left him with a concussion and persistent, debilitating injuries. In this action, Plaintiff seeks to hold responsible D.C. United and his former head coach, Defendant Benjamin Olsen, for their negligence in supervising Espindola and for Espindola's tortious conduct under the theory of respondeat superior liability.

Now before the court is Defendants D.C. United and Olsen's Motion to Dismiss. Defendants advance two arguments. First, they assert that Plaintiff's claims are preempted by federal labor law because resolving Plaintiff's tort claims would require interpreting and applying the terms of a collective bargaining agreement ("CBA") between MLS and the players' union. Second, Defendants contend that Plaintiff's claims must be dismissed because the sole remedy available to him arises under the District of Columbia Workers' Compensation Act.

Because Defendants attach the CBA and other evidence to their Motion to Dismiss, the court converts their Motion into one for summary judgment and, for the reasons that follow, denies summary judgment at this early stage without prejudice.

## II. BACKGROUND

### A. Factual Background

After a three-year stint with English soccer teams, Plaintiff Charles Horton, a goalkeeper, began his professional soccer career in the United States when he signed a contract with MLS in February 2016. First Am. Compl., ECF No. 14 [hereinafter Am. Compl.], ¶¶ 8–12. The District of Columbia's MLS team, Defendant D.C. United, acquired his rights. *Id*. ¶ 12. Defendant Benjamin Olsen is the head coach of D.C. United. *Id*. ¶¶ 3, 13.

Six weeks after signing the contract, tragedy struck Plaintiff. On March 29, 2016, Plaintiff's teammate, Fabian Espindola, attacked Plaintiff in the team's training room. *Id*. ¶¶ 13, 15–17. According to Plaintiff, following a video review session, Espindola began arguing with him about an "on-field issue" that had occurred two weeks earlier. *Id*. ¶ 16. Plaintiff told Espindola that he did not want to continue arguing and turned away, at which point Espindola "viciously struck" Plaintiff with his elbow, landing a blow on Plaintiff's left temple. *Id*. ¶ 17. Teammates and staff saw the incident and pulled Espindola away from Plaintiff. *Id*. Although Plaintiff immediately began experiencing symptoms associated with a concussion—including nausea, dizziness, shakiness, and sensitivity to light and sound—the team did not place him into MLS's concussion protocol, but instead allowed him to practice with the team that day. *Id*. ¶ 18.

Later that same day, Plaintiff met with his coach, Defendant Benjamin Olsen, to talk about the incident. *Id*. ¶ 19. At that meeting, Olsen "expressed to Mr. Horton" that he knew "Espindola had a history of violent conduct on and off the field." *Id*. ¶ 20. Olsen added that he had thought

"it was only a matter of time" before Espindola acted violently toward a D.C. United teammate. *Id.* Before attacking Plaintiff, Espindola had been repeatedly disciplined for violent acts, including a six-game suspension in 2014 for "physically attacking a referee" during a match, a two-game suspension in 2014 for "violent conduct" toward another player, and an ejection from a game in July 2015 for attempting to elbow an opposing player in the head. *Id.* ¶ 21. Plaintiff, however, knew nothing of Espindola's track record. *See id.*

In the hours that followed the attack, Plaintiff's symptoms became more severe. *Id.* ¶ 22. He reported to practice the next day, on March 30, 2016, but he could not take the field. *Id.* D.C. United's athletic trainer ordered Plaintiff not to train, and a team physician diagnosed Horton with a concussion, after which Horton entered the concussion protocol. *Id.* The concussion sidelined Plaintiff for weeks. *See id.* ¶ 24. During that time, he continued to grapple with symptoms ranging from memory loss to chronic headaches and lack of concentration, and he underwent a variety of neurological, neurophysiological, and ophthalmological exams and treatments. *Id.*

In May 2016, even though his concussion symptoms remained, Plaintiff was medically cleared to play. *Id.* ¶ 26. He was "relegated temporarily to a lower-league team" as he tried to recover, but, while training there, Plaintiff broke a finger—an injury that prevented him from continuing with D.C. United that season. *Id.* Plaintiff never rejoined the team. He tried to reclaim his position in the 2017 season, but he "was unable to regain" the same level of play as before the attack by Espindola and the resulting concussion. *Id.* ¶ 27. At some point, Olsen and the D.C. United coaching staff told Plaintiff he "would no longer be a member of the D.C. United club." *Id.* Plaintiff then retired from professional soccer. *Id.* ¶ 28.

### B. Procedural Background

Plaintiff filed suit against Espindola, Olsen, D.C. United, and MLS on March 27, 2017, in the Superior Court of the District of Columbia. *See* Receipt of Original File, ECF No. 10, at 2–6.[1] Defendants D.C. United, MLS, and Olsen filed a Notice of Removal on June 22, 2017, asserting that this court has federal-question jurisdiction over the case pursuant to 28 U.S.C. § 1331, because Section 301 of the Labor Management Relations Act ("LMRA"), 28 U.S.C § 185, preempts Plaintiff's claims. *See* Notice of Removal, ECF No. 1, ¶¶ 4–5.[2] Once removed, the three filed an Answer. *See* Answer, ECF No. 7.

On August 4, 2017, Plaintiff sought leave to file an Amended Complaint, *see* Mot. for Leave to File, ECF No. 12, which the court granted, *see* Minute Order, Aug. 7, 2017. The First Amended Complaint alleged one count of negligent supervision against Olsen and D.C. United; negligent hiring and retention against MLS; and assault, battery, and intentional infliction of emotional distress against Espindola. *See generally* Am. Compl. Additionally, Plaintiff sought to hold MLS and D.C. United vicariously liable for Espindola's and Olsen's torts under the theory of respondeat superior liability. *See id*. at 13–15.

In response to Plaintiff's amended pleading, Defendants Olsen, D.C. United, and MLS filed a joint Motion to Dismiss. *See generally* Defs.' Mot. to Dismiss, ECF No. 17 [hereinafter Defs.' Mot.]. Defendants asserted two grounds for dismissal. First, they maintained that all of Plaintiff's claims are preempted by Section 301 of the LMRA, because his state law claims are "substantially dependent upon analysis of the terms" of the CBA between MLS and the MLS

---

[1] Citations are to the page numbers automatically generated by CM/ECF.

[2] Plaintiff did not serve Espindola before the other three defendants removed the case to this court. Espindola is believed to be living outside the United States. *See* Joint LCvR 16.3 Report to the Court, ECF No. 11, at 1 n.1. In early March 2018, Plaintiff requested a summons for Espindola, *see* Request, ECF No. 27; Summons Issued Electronically, ECF No. 28, but service appears not to have been accomplished.

4

Players Union. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). Alternatively, Defendants insisted that Plaintiff's claims must be dismissed because the exclusive remedy for Plaintiff's injuries, which he "sustained in the course of [his] employment," is under the District of Columbia Workers' Compensation Act ("WCA"), D.C. Code § 32-1504. *See* Defs.' Mem. at 30–33. To support these arguments, Defendants attached to their Motion: (1) a copy of the current CBA; (2) a copy of the Standard Player Agreement ("SPA"), an exhibit to the CBA that outlines the terms of Plaintiff's employment with D.C. United; and (3) an Affidavit from William Ordower, the executive vice president and general counsel of MLS, attesting to the authenticity of the two agreements. *See generally* Defs.' Mot., Attach. 2, Ex., ECF No. 17-2.

On the same day that Plaintiff filed his opposition to Defendants' Motion, he filed a Notice of Dismissal of his claims against Defendant MLS. *See generally* Notice of Dismissal, ECF No. 22. Thus, the instant motion now concerns only Defendants D.C. United and Olsen ("Defendants").

### III. DISCUSSION

#### A. Whether Defendants' Motion to Dismiss Should Be Converted into a Motion for Summary Judgment

Although Defendants have styled their motion as a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, their motion attaches and relies heavily upon the CBA and SPA. The introduction of these records raises the threshold question of whether the court should evaluate Defendants' motion under Rule 8(a)'s pleading standard or Rule 56's summary judgment standard. Not surprisingly, Defendants wish to proceed under Rule 8(a), while Plaintiff insists the court apply Rule 56's more rigorous standard, particularly because he has not yet had the opportunity to take discovery.

Rule 12(d) requires courts to treat a motion to dismiss brought under Rule 12(b)(6) as a motion for summary judgment when "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(d); *see Hurd v. District of Columbia*, 864 F.3d 671, 686–87 (D.C. Cir. 2017). Not all outside-the-pleadings evidence, however, requires conversion of a motion to dismiss. Under the incorporation-by-reference doctrine, a defendant can submit—and the court can consider—a document that "is not attached by the plaintiff, but is referred to in the complaint and integral to the plaintiff's claim." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (cleaned up); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 (3d ed. 2014). A document is "integral" to the complaint if it "form[s] the basis for a claim or part of a claim." *Banneker Ventures*, 798 F.3d at 1133 (quoting *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004)).

Here, Defendants offer two reasons to treat the CBA and SPA as incorporated into the complaint, but neither is convincing. First, they argue that the two contracts are incorporated because Plaintiff's Amended Complaint "specifically mentions the SPA, and the CBA (of which it forms a part and incorporates by reference) is integral to Plaintiff's claims." Defs.' Mot., Mem. of Pts. & Auths. in Supp., ECF No. 17-1 [hereinafter Defs.' Mem.], at 14 n.5.[3] But merely "mention[ing]" the SPA, and alluding to the CBA, does not make either contract an "integral" part of the pleading. The CBA or SPA must "form" the basis for one or more of Plaintiff's claims. Yet

---

[3] Defendants accurately characterize the complaint as only "mentioning" the CBA and SPA. The SPA is the only contract referenced in the Amended Complaint, and it appears in paragraph 14, which states in full:

> The employment contract Mr. Horton signed with MLS expired on December 31, 2016. Under this employment contract, MLS had the unilateral discretion at the end of the contract period to extend Mr. Horton's playing services for an additional twelve months or conversely refuse Mr. Horton's future services. MLS had this discretion for the 2017, 2018, and 2019 seasons pursuant to their employment of Mr. Horton. MLS was at all relevant times solely responsible for paying Mr. Horton's compensation and benefits and negotiating any and all details of his employment.

Am. Compl. ¶ 14.

6

here neither agreement is relevant to any of Plaintiff's tort claims against Defendants D.C. United and Olsen. The SPA arguably might have formed the basis for Plaintiff's respondeat superior theory against MLS, but MLS is no longer a defendant. Thus, both the CBA and SPA are matters outside the pleading, requiring the court to convert Defendants' motion into one for summary judgment. *See Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 203 (2d Cir. 2013) (holding that the district court erred by failing to convert a motion to dismiss into one for summary judgment where the CBA was not attached to the plaintiff's complaint); *Freeman v. MedStar Health Inc.*, 87 F. Supp. 3d 249, 259 (D.D.C. 2015) ("Because Plaintiffs do not bring claims under the Collective Bargaining Agreement, the Court cannot consider the Agreement without converting the pending motion to a motion for summary judgment.").

Second, Defendants argue that the court may consider the CBA and SPA, without converting their motion to one for summary judgment, because a plaintiff "cannot, by tactical silence, avoid" the existence and relevance of a CBA. Defs.' Reply, ECF No. 26, at 4. That argument fails, however, because "[t]he plaintiff is master of the complaint and may assert state law causes of action that are independent of the CBA." *Nakahata,* 723 F.3d at 203 (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394–95 (1987)). Plaintiff here was under no obligation to plead a claim founded on the CBA or reference the agreement in his pleading. *See id.* Thus, because Defendants have presented the CBA and SPA with their motion, the court treats it as one for summary judgment.

**B.     Whether Defendants Are Entitled to Summary Judgment**

Under Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury

7

could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015). In assessing a motion for summary judgment, the court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although a party may bring a Rule 56 motion "at any time," Fed. R. Civ. P. 56(b), courts are reluctant to grant summary judgment before the plaintiff has had the opportunity to take discovery, as is the case here. *See Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (stating that "summary judgment is premature unless all parties have had a full opportunity to conduct discovery") (internal quotation marks and citations omitted); *Americable Int'l v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997) (stating that "summary judgment ordinarily is proper only after the plaintiff has been given adequate time for discovery" (internal quotation marks and citation omitted)).

With these principles in mind, the court turns to Defendants' arguments, addressing first their preemption defense and then their invocation of the WCA.

### 1. *Section 301 Preemption*

Section 301 of the LMRA confers exclusive federal jurisdiction over controversies involving CBAs and preempts any state-law causes of action if such claims are either: (1) founded on rights created by a CBA, or (2) substantially dependent upon analysis of the terms of such agreement. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405, 410 n.10 (1988). Thus, "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," the claim must be treated as arising under section 301 or, alternatively, dismissed as preempted. *Allis-Chalmers,* 471 U.S. at 220. Here, Defendants assert that any conversion to a Section 301 claim would be futile as such a claim would be foreclosed because Plaintiff failed to exhaust remedies as required by the CBA and time barred

8

because he did not file suit within Section 301's six-month limitations period. Defs.' Mem. at 24–25. Entry of judgment in their favor, Defendants insist, is therefore the only proper outcome.

The court starts by asking whether Section 301 preempts Plaintiff's intentional tort claims—assault, battery, and intentional infliction of emotional distress—predicated on respondeat superior liability. An employer may be held liable for the intentionally tortious acts of its employees committed within the scope of employment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001). Under District of Columbia law, an employee acts within the scope of his employment as long as "the employee [is] actuated, at least in part, by a desire to serve his principal's interest." *Brown*, 782 A.2d at 758 (internal quotation marks and citation omitted). Such actions "need not be wholly in furtherance of the employer's business." *Blair v. District of Columbia*, Nos. 16-cv-1211 & 16-cv-1212, 2018 WL 3651395, at *9 (D.C. Aug. 2, 2018). Rather, "if the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge." *Id*. (quoting *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014)). Ordinarily, whether an employee acted within the scope of his employment is a question of fact for the jury. *See Brown,* 782 A.2d at 757.

Defendants assert that Plaintiff's intentional tort claims are preempted because the court necessarily must analyze the CBA to determine whether Espindola was acting within the scope of his employment when he struck Plaintiff. Defs.' Mem. at 23–24. To illustrate the CBA's purported relevance, Defendants direct the court to Article 8 of that agreement, which describes the scope of an MLS player's obligations and duties, and Section 4 of the SPA, titled "Player Obligations," which sets forth the mental and physical standards an MLS player is required to maintain. *Id*. at 23. Without reference to these provisions, Defendants claim, it will be "impossible

9

for the court to determine whether the alleged incident that took place between Plaintiff and Defendant Espindola was in the course and scope of Espindola's employment." *Id.* at 24.

The court is unpersuaded. Defendants have offered no evidence to suggest how Espindola's conduct, as described by Plaintiff, could possibly fall outside his duties and responsibilities as a player. Indeed, it is hard to conceive why the fact question of Espindola's scope of employment will be "substantially dependent" on an analysis of the CBA. *See Allis-Chalmers*, 471 U.S. at 220. As Plaintiff has described the incident, Espindola attacked him in a training room, in the presence of coaches and teammates, following the team's video review of a prior game. Am. Compl. ¶¶ 15–17. Such circumstances would appear to encompass the core duties and responsibilities of a professional soccer player. Defendants seem to concede as much, asserting, in the context of their WCA argument, that "Plaintiff's claims arise out of injuries alleged to have been sustained *in the course of Plaintiff's employment*." Defs.' Mem. at 4 (emphasis added). Defendants do not attempt to reconcile the tension between their certainty that Plaintiff suffered his injuries "in the course of [his] employment," with their position that resort to the CBA is necessary to determine whether Espindola was acting within the scope of his employment. Absent any reason to believe that the CBA will need to be consulted to determine whether Espindola was acting within the scope of his employment, the court cannot, at this stage, find Plaintiff's intentional tort claims to be preempted as a matter of law.

As to the negligent supervision claim, Defendants argue preemption on the ground that the court must look to the CBA to define the standard of care Defendants owed to Plaintiff and to determine whether that standard was breached. *See id.* at 18–20. Both questions, Defendants maintain, implicate the CBA because that contract establishes rules as to the type of discipline available, when it may be imposed, and by whom (MLS or D.C. United). *See id.* Defendants cite

a host of non-binding authority to support their argument and so, too, does Plaintiff for the contrary position.

Defendants' preemption defense regarding the negligent supervision claim presents a closer call, but ultimately fails for lack of factual support. Under District of Columbia law, when negligence is alleged to have occurred "in a context which is within the realm of common knowledge and everyday experience," the plaintiff need not provide expert testimony to establish the applicable standard of care or prove the defendant's breach of it. *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 200 (D.C. 1991). Expert testimony is required, however, "where the subject presented is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Id.* (internal quotation marks and citation omitted). Here, it may be that the CBA provisions are essential to defining the standard of care and proving a breach. But, at this juncture, Defendants' assertion that the CBA is not merely relevant but controlling is a legal argument; it is not supported by any evidence, expert or otherwise. "Because preemption cannot be readily discerned from the pleadings alone, it would be improper to resolve the question of preemption at this stage." *Freeman*, 87 F. Supp. 3d at 259; *accord Nakahata*, 723 F.3d at 203 ("It is a defendant's responsibility to raise preemption by the CBA as a defense, but . . . a motion addressed to the adequacy of the pleadings is not necessarily the proper place for preemption to be decided."). Accordingly, Defendants' motion as to Plaintiff's negligent supervision claim on Section 301 preemption grounds also is denied.

2.  *Immunity under the D.C. Workers' Compensation Act*

Having concluded that Defendants are not entitled to summary judgment at this stage based on Section 301 preemption, the court turns to their alternative argument: That the WCA confers upon them immunity from Plaintiff's tort claims. The WCA provides a no-fault system of liability

for the accidental injury or death of employees in the District of Columbia occurring within the course of employment. *See Grillo v. Nat'l Bank of Wash.*, 540 A.2d 743, 748 (D.C. 1988). For qualifying injuries, the WCA is the employee's "exclusive remedy." D.C. Code § 32-1504(b). The statute's preclusive effect is broad, applying even to injuries sustained by an employee from intentional torts, such as assaults, committed by co-workers. *See Harrington v. Moss*, 407 A.2d 658, 662 (D.C. 1979) ("[A]n injury suffered from an assault may arise out of employment within the meaning of the [WCA] if the reason for the assault is a quarrel having its origin in work."); *see also Johnson v. District of Columbia*, 528 F.3d 969, 978 (D.C. Cir. 2008) (observing that "that the WCA does cover injuries intentionally caused by a co-worker"). "[O]nly injuries specifically intended by the employer to be inflicted on the particular employee who is injured fall outside of the exclusivity provisions of the WCA." *Grillo*, 540 A.2d at 744.

The parties here do not dispute that, if applicable, the WCA would provide the exclusive remedy for Plaintiff's injuries. Their disagreement centers on whether D.C. United qualifies as an "employer" under the WCA and is thus immune from suit. The Act defines an "employer," in relevant part, as "includ[ing] any individual, firm, association, or corporation, or receive, or trustee of the same . . . using the service of another for pay within the District of Columbia." D.C. Code § 32-1501(10). The D.C. Court of Appeals recognizes that for purposes of the WCA, the term "employer" includes a joint employer, or a "special," employer—an employment situation that arises when an employer lends an employee to another party. *See Union Light & Power Co. v. D.C. Dep't of Emp't Servs.*, 796 A.2d 665, 667 n.3, 669 (D.C. 2002); *see also USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008) ("Under the workers' compensation laws of Maryland and the District of Columbia, a worker may have more than one employer at the same time."). To qualify as a special employer, an entity or "second employer" must satisfy three criteria: (1) "the employee

has made a contract of hire, express or implied, with the second employer"; (2) "the work being done is essentially that of the second employer"; and (3) "the second employer has the right to control the details of the work." *Union Light & Power Co.*, 796 A.2d at 667 n.3 (quoting 3 Arthur Larson, *Larson's Workers' Compensation Law* § 67.01[1] (2001)). An employee seeking to establish special employment status must "overcome the presumption favoring continuance of the general employment." *Id.* at 669.

Defendants contend that D.C. United was Plaintiff's special employer for two reasons. *See* Defs.' Mem. at 27–30. First, although Defendants acknowledge that Plaintiff signed an employment agreement only with MLS, and not D.C. United, they contend that D.C. United is a "joint" employer because the CBA provides that: "[f]or purposes of workers compensation coverage, the parties"—MLS and the players' union—"acknowledge and agree that MLS and the Team that the Player has been assigned to are joint employers of that Player." *See id.* at 28 (quoting the CBA). Phrased alternatively, Defendants would have this court conclude, as a matter of law, that D.C. United is Plaintiff's special employer, and thus enjoys the WCA's immunity, because the players' union and MLS entered into a contract stating as much. District of Columbia law is to the contrary, however. The D.C. Court of Appeals has stated that, "[u]nder workers' compensation law, the companies' characterization of their temporary staffing arrangement cannot be allowed to override its reality." *Love*, 954 A.2d at 1036. Rather, the "nature of that relationship must be ascertained not from the label given to it by the parties themselves but from the consequences which the law attached to their arrangements and to their conduct." *Id.* (quoting *Danek v. Meldrum Mfg. & Eng'g Co.*, 252 N.W. 2d 255, 261 (Minn. 1977)). Thus, the court here cannot simply look to what the CBA says about D.C. United's status as an employer; it "must examine the substance and effect of [D.C. United's] commitments to [MLS]" and its relationship

13

with Plaintiff. *Id.* Accordingly, the court concludes that the CBA does not control D.C. United's status as a special employer.

Defendants' second argument relies on *Namoff v. D.C. Soccer*, No. 2012 CA 7050 (D.C. Super. Ct. May 8, 2014), a case in which a D.C. Superior Court judge held that the WCA barred a player's claim against D.C. United for negligent medical treatment, because D.C. United "concurrently" employed the plaintiff with MLS. *See* Defs.' Mem. at 28–30. Defendants ask the court to "honor and adopt" the decision in *Namoff* here. *Id*. at 28, 30. The court declines to do so.

"Whether an individual is a special employee is generally a question of fact," *Union Light & Power Co.,* 796 A.2d at 669, and other than the CBA and SPA, there is no record before this court on which to find that D.C. United was *this* Plaintiff's "special employer." The facts here, once developed, may point to a different conclusion than *Namoff*. For instance, the CBA Defendants say is applicable in this case was created after *Namoff* was decided in 2014. *See* Defs.' Mem. at 5 ("Plaintiff was employed by MLS pursuant to the terms and conditions of employment contained in the '2015 Collective Bargaining Agreement[.]'"). Whether that different agreement changes the analysis remains to be seen. Moreover, even if D.C. United does qualify as a special employer, it must have contributed to the purchase of workers' compensation insurance to enjoy immunity. *See* D.C. Code § 32-1534(a); *Love*, 954 A.2d at 1032 (stating that when "a worker [has] more than one employer at the same time . . . both employers are obligated to provide the employee with workers' compensation coverage"). This record contains no evidence as to D.C. United's contribution, or lack thereof, to securing workers' compensation insurance for its players. This is not to say that *Namoff* got it wrong. Rather, in the absence of a well-developed factual record that informs the "reality" of the relationship between Plaintiff, D.C. United, and MLS, the court

14

declines to grant summary judgment in favor of the Defendants based on *Namoff* alone. *See Love*, 954 A.2d at 1036.

## V. CONCLUSION AND ORDER

For the foregoing reasons, the court converts Defendants' Motion to Dismiss into a motion for summary judgment and denies that motion without prejudice. In light of the court's denial of summary judgment to Defendants, there is no need for the court to address Plaintiff's Rule 56(d) arguments as to his alleged need to conduct additional discovery.

Dated: August 8, 2018

Amit P. Mehta
United States District Judge